**SO ORDERED: September 30, 2011.**



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re:                                    )
                                          )
CASTLETON PLAZA, LP,                      )            Case No. 10-1444-BHL-11
                                          )
            Debtor.                       )

### ORDER ON DEBTOR'S MOTION TO DETERMINE VALUE OF COLLATERAL

This matter is before the Court on the **Debtor's Motion for Determination of Allowable Secured Claim** [Docket no. 83], filed July 1, 2011.  The secured creditor, EL-SNPR Notes Holdings, LLC (the "Creditor"), on August 12, 2011, filed a notice of its election to have its claim allowed as fully secured under § 1111(b)(2),[1] which fixed the valuation of its claim and removed it from the ambit of § 506 but did not relieve the Court of its obligation to determine the value of the collateral at issue.  The Court conducted an evidentiary hearing on September 9, 2011.  The Debtor submitted briefs in support of its motion before and after the hearing [Docket nos. 133 and 143, respectively], and the Creditor submitted a brief in support of its position

---

[1] Unless otherwise indicated, all citations to statutes refer to Title 11 of the United States Code (the "Bankruptcy Code").

[Docket no. 144].  Having considered the foregoing, the Court, for reasons set forth below, finds the value of the Creditor's secured claim to be $8,250,000.00.

<u>Background</u>

The Debtor, a single-asset real estate entity as contemplated by § 101(51B), owns a retail shopping complex in the Castleton area of Indianapolis consisting of two parcels totaling over 14 acres and four buildings with approximately 175,000 rentable square feet among them.  The shopping center is located near a busy, upscale mall and is in one of the premier retail locations in central Indiana.  However, the shopping center is not ideally situated.  The orientation of the buildings leaves many of the units obscured from the view of passersby on the busy adjacent road.  Further, there are problems with access, as vehicles cannot travel directly from the nearby mall without taking a circuitous route and there is no direct ingress from or egress to the main road.  The Debtor plans a construction project that will ameliorate some of the access problems.

In order to finance its purchase of the real property and its operations, the Debtor borrowed $9,500,000.00 and gave the lender a note and a security interest including a mortgage and an assignment of its leases with retail merchants and its rents.  The lender's rights passed through a series of assignments before the note matured and its holder, unwilling to refinance the debt, initiated a foreclosure in January 2011.  The Creditor purchased the lender's interest the next day, as part of a larger sale of distressed properties at a significant discount.  The Creditor's claim dwarfs the Debtor's other obligations, which consist mostly of trade debt.  The Debtor filed for relief in this Court on February 16, 2011.

The Creditor maintains that its claim is oversecured.  On July 7, 2011, it filed a proof of claim for $10,244,659.39, asserting that the value of the Debtor's property in which it has a security interest is worth $10,500,000.00.  The Creditor now urges the Court to find that the property's value, for purposes of the Debtor's forthcoming plan of reorganization, is at least

$11,065,000.00, and now proposes a value of the shopping center between $5,864,141 and $7,600,000.

## Discussion

When the Debtor originally filed its motion, its purpose was to determine the value of the Creditor's interest in the Debtor's property pursuant to § 506(a)(1). Such a determination would have been necessary to fix the Creditor's allowable secured claim pursuant to § 502, i.e., since the total amount of the Creditor's claim is not in dispute, to decide whether and to what extent the Creditor is oversecured or undersecured and, if the latter, to bifurcate the Debtor's claim into a secured claim and an unsecured claim. *See generally Welzel v. Advocate Realty Inv., LLC*, 275 F.3d 1308, 1318 (11th Cir. 2001) (describing the interplay of the two provisions and observing that "[§] 502 deals with the threshold question of whether a claim should be allowed or disallowed [while] § 506 deals with the entirely different, more narrow question of whether certain types of claims should be considered secured or unsecured").

In the interim, however, the Creditor elected to have its claim treated as fully secured, as is its right under § 1111(b), which provides, *inter alia*, that a secured creditor's claim "shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim" and that a creditor that so elects shall have its entire allowed claim treated as fully secured "notwithstanding section 506(a)." Though the election formally "blocks the bifurcation of an undersecured claim under section 506(a) into secured and unsecured portions," 4 Collier on Bankruptcy ¶ 506.03[7][d][ii] at 506-77 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.), it is tempered by application of § 1129(a)(7)(B), which provides that a uniquely situated secured creditor must "receive or retain under the plan...value, as of the effective date of the plan, that is not less than the value of such holder's" security interest. Reading §§ 1111(b) and 1129(a)(7) together and applying them to the instant

case, the upshot is that the Debtor's plan must propose to pay the electing Creditor the nominal value of its entire allowed claim; however, the Creditor need only receive future payments with a present value equal to the value of the collateral.  Fundamentally, then, the import of a § 1111(b) election is that the creditor trades its deficiency claim for a continuing lien on the collateral in the full amount of its allowed claim.  *See generally Id.* ¶ 1129.02[7][d].  *See also 680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co.*, 29 F.3d 95 (2d Cir. 1994) (discussing the policies underpinning § 1111(b) and its application in a different context).  The Court sees no reason why the standard by which it must determine the shopping center's value should differ in the context of §§ 506(a) and 1111(b).  By previous order of the Court, the Creditor may rescind its § 1111(b) election within three business days after the date of this order.  Regardless of the Creditor's decision in this regard, the valuation of the shopping center contained herein will be the finding of the Court under either circumstance.

The Supreme Court's decision in *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997), is the primary authority on valuation in bankruptcy.  In that case, the Court considered the valuation of the creditor's secured claim when a Chapter 13 debtor invoked the cramdown provision of § 1325(a)(5), which, by operation of § 506(a), limits a creditor's secured claim to the value of the collateral.  Though *Rash* was not decided in the context of Chapter 11, it is routinely applied to cases arising under its provisions.  *See, e.g.*, *HSBC Bank USA v. UAL Corp.*, 351 B.R. 916 (Bankr. N.D. Ill. 2006).

*Rash* expressly forbids use of a foreclosure or distressed-sale standard for purposes of § 506(a), and directs that the proper standard is "replacement value."  *Assocs. Comm. Corp. v. Rash*, 520 U.S. at 959-60.  The Court then defined that term as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  *Id.* At 960.  The opinion further emphasizes the context of the inquiry and the statutory requirement

-4-

that value be determined in light of "the proposed disposition or...use." *Id.* at 962.  The Court's observation that Rash "elected to use the collateral to generate an income stream," and "[t]hat actual use...is the proper guide," *Id.* at 963, seems to suggest the continued viability of cases that focused on a property's future earnings.  *See, e.g.*, *Nat'l Rural Utilities Coop. Fin. Corp. V. Wabash Valley Power Ass'n, Inc.*, 111 B.R. 752, 768 (S.D. Ind. 1990) (holding that a property's "going concern value under 11 U.S.C. § 506(a)...must be based upon its future earning capability").  Ultimately, *Rash* charges bankruptcy courts, "as triers of fact, [with] identif[ying] the best way of ascertaining replacement value on the basis of the evidence presented," 520 U.S. at 965 fn. 6, while admonishing them not to use "a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases." *Id.* at 964 fn. 5.

This Court has previously read *Rash* to require it, in deciding a motion under § 506(a), to "ascertain the price this Debtor would pay for the same collateral in the available market."  *In re Olio Dental, Inc.*, Case. No. 08-10305-BHL-11 [Docket no. 161] at *4 (Bankr. S.D. Ind. 2009). In endorsing this standard again, the Court acknowledges that its inquiry in the instant case is informed by evidence of the future earnings the shopping center is predicted to generate.

In the case at bar, the Court heard testimony from two appraisers, Mr. Lady and Mr. Jameson.  Though the experts arrived at different conclusions, they relied on similar and commonly employed methodologies.  The Court finds that some of the tools of their profession are not especially helpful in determining the value of this particular property at this particular time.  For example, in appraising commercial real estate a common approach utilizes comparable sales of similar property.  Here, neither of the appraisals identified other transactions that were meaningfully comparable.  This is partly due to the unique qualities of this shopping center, but is primarily attributable to the scant number of sales during the current economic downturn, which has now prevailed for several years.  Another method used by the appraisers is to identify

a time in the future when rental income will stabilize, and then determine the present value of that predicted future income.  Mr. Lady testified that that magic date is May of 2013, or about eighteen months in the future.  The Court finds neither any reason to doubt the sincerity of Mr. Lady's opinion nor any evidence to support it.

Yet another technique employed by the appraisers is to determine a capitalization rate based on an assumption that there would be a particular mix of equity and borrowing used to fund a hypothetical purchase.  The value arrived at by the formula is extremely sensitive to changes in the capitalization rate.  Both appraisers assumed a mix of 70% equity and 30% debt in arriving at their capitalization rates of 10.0% and 10.2%.  Most compelling to the Court, however, is the testimony that lenders in the current market are unwilling to finance purchases of real property like this shopping center.  Therefore, a buyer of such property would most likely be a 100% cash purchaser that would demand a higher rate of return on its investment because of the greater exposure.

The parties have disputed other components of value, such as the probable rental price per square foot for the various vacant units and the probable future ratio of occupancy to vacancy.  In that regard, the Court finds most persuasive the testimony of Joyce Bradley, an employee of the Debtor with considerable experience managing similar properties.  Ms. Bradley has been "on the ground."  Her review of the existing leases and forecast of the future income they will generate is based in part on her actual discussions with tenants and the current asking price for vacant units.  She predicts a 75% occupancy rate and an average monthly price for new leases of $7.17 per square foot.  Her estimates, while not determinative, are the best evidence before the Court.  As the Creditor's economist, Mr. Mounts, testified, the rental rate and occupancy rate are inversely related; all units would be rented at a monthly rate of one dollar per square foot, and none would be rented for twenty dollars per square foot.

-6-

After all the expertise, the formulas, the projections, and the conflicting evidence, the Court is left with some basic truths concerning the value of this property. The economic downturn has made financing and purchasing property like the shopping center difficult. No one knows if or when the commercial real estate market will stabilize and we will return to what was characterized by one expert as the "good old days." Many of the traditional tools used by professionals and the courts to determine value are of little worth in the current economy. There are few probative comparable sales because most properties like the shopping center have recently changed hands in foreclosure sales or in bankruptcy. After considering the evidence, the arguments of counsel, the briefs and the calculations contained therein, and having concluded that a *Rash* analysis would dictate discounting the value in light of the concerns and considerations of a buyer of this property, the Court determines the value of the collateral (including the outlot) for purposes of the Debtor's forthcoming Chapter 11 plan to be $8,250,000 as of the effective date of the plan, up to and including February 15, 2012.

IT IS SO ORDERED.

###